
E-FILED
Monday, 31 January, 2005 03:12:28 PM
Clerk, U.S. District Court, ILCD

IN THE UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

| | | |
|---|---|---|
| MARTHA BENNETT, | : | |
| Plaintiff, | : | **FIRST AMENDED COMPLAINT** |
| vs. | : | |
| MERCK & COMPANY INC., | : | Case No. 2:05-cv-02006<br>Judge Harold A. Baker |
| Defendant. | : | |

FILED
JAN 31 2005
JOHN M. WATERS, Clerk
U.S. DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA, IL

Plaintiff by and through the undersigned counsel hereby allege and complain against Merck & Company, Inc. (hereafter referred to as "Merck") as follows:

**PARTIES & JURISDICTION**

1. Plaintiff is a resident of Kankakee County, State of Illinois. Plaintiff ingested Vioxx, developed, manufactured, marketed, labeled, distributed, and promoted by Merck. As a result of Plaintiff's Vioxx use, Plaintiff sustained serious and permanent neurological injuries, including but not limited to stroke, cardiac dysfunction, cognitive deficits, and other permanent and life altering injures.

2. Merck is, and at all relevant times, a corporation organized under the laws of the State of New Jersey with its principle place of business at One Merck Drive, Whitehouse Station, New Jersey, and is therefore, a citizen of New Jersey for purposes of determining diversity under 28 U.S.C. Section 1332(c)(1). At all times relevant, Merck marketed, manufactured, distributed, promoted, and labeled Vioxx in interstate commerce and in the State of Illinois.

3. This court has subject matter jurisdiction pursuant to 28 U.S.C. Section 1332 because this is a civil action in which the amount in controversy exceeds $75,000.00.

**FACTUAL ALLEGATIONS**

4. Vioxx is a Cyclooxygenase-2 (Cox-2) selective inhibitor and as such was marketed as providing a lower incidence of gastrointestinal upset and a lower ulcerogenic potential. However, inhibiting the Cox-2 enzyme selectively causes an imbalance between Prostacyclin (PGI) and Thromboxane A-2 (TX A2). Because "TX A2 is a major compound in the clotting process, and is a potent platelet aggregator and vasoconstrictor," the resulting imbalance between PGI and TX A2 places patients at an increased risk of thromboembolic events, primarily heart attacks and strokes. *The Merck Manual* (16th ed. 1992).

5. Merck, the maker of Vioxx, is also the publisher of *The Merck Manual* (16th ed. 1992), which includes the following definition: "Thrombaxane A-2 is a major compound involved in the clotting process, and is a potent platelet aggregator and vasoconstrictor." This section of *The Merck Manual* was not included in the 17th edition, published in 1999.

6. Even before Vioxx was introduced to consumers it was controversial. The Wall Street Journal reported that internal Merck documents established that as early as 1997 Merck was concerned that proposed clinical trials would show that Vioxx patients would have more blood clots than those taking another drug, and that this would "kill the drug."

7. Prior to the introduction of Vioxx into the market place, Merck faced another crucial issue when initial studies on pain relief and Vioxx were disappointing. In fact, older medicines, such as aspirin and Aleve (naproxen) provided better pain relief than Vioxx. In simple terms, Vioxx did not work as marketed, promoted, distributed and presented by Merck.

8. This did not deter Merck. In need of a billion dollar drug, as patents on several of Merck's drugs were expiring in 2000 and 2001, Merck launched Vioxx in 1999.

9. With annual sales of Vioxx exceeding **$2.5 billion,** Merck would continue to "dodge" the storm of controversy Vioxx created.

10. Merck chose to keep its concerns about Vioxx being linked to heart attack and stroke private. Merck chose early not to submit its data to a peer-reviewed journal until the following year and the results did not appear in print until November 23, 2000, one and a half years after commercial approval.

11. However, in June of 2000, studies presented at the European United Legal Against Rheumatism (EULAR), an organization in which Merck is a member of and corporate sponsor, revealed that Vioxx use resulted in statistically significant increase in myocardial infarction and hypertension. In response, Merck chose not to publish the studies and simply denied them.

12. In early 2000, the initial results of the VIGOR study came in. They showed that Vioxx patients suffered significantly more blood-clot-related problems than naproxen users. This result was exactly what Merck officials believed before Vioxx was introduced into the marketplace.

13. The VIGOR study revealed that Vioxx users had **4 times more heart attacks** than naproxen users.

14. As a result, a March 9, 2000, email written by Dr. Scholnick, Merck's Chief Researcher, revealed that Merck clearly recognized that Vioxx caused adverse cardiovascular events - heart attacks and strokes. With the subject line of VIGOR, Dr. Scholnick wrote that "cardiovascular events are clearly there," this according to the Wall Street Journal.

15. Instead of changing the label for Vioxx, informing doctors, pharmacists, and users of Vioxx, Merck chose to promote Vioxx. Merck launched an advertising campaign promoting the benefits of Vioxx without mentioning the deadly adverse cardiovascular events associated with the use of the drug.

16. Merck's aggressive marketing of Vioxx with presentations to doctors highlighting Merck's alleged benefits of Vioxx caught the attention of the FDA which found the marketing and promotion of Vioxx to be misleading resulting in Merck receiving a Warning Letter from the FDA which stated:

> "Your suggestion that COX-2 inhibitors, including Vioxx, have an overall safety profile to other NSAIDs is misleading because such an advantage has not been demonstrated. In fact, in the VIGOR study the incidence of serious adverse events was higher in the VIOXX treatment group than in the naproxen treatment group."

17. The FDA Warning Letter went on to state that "Merck sales representatives have engaged in false or misleading promotional activities that also minimizes the potentially serious MI result observed in the VIGOR trial."

18. The FDA also warned Merck that the Vioxx audio conferences were in violation of Federal Food, Drug and Cosmetic Act and ordered Merck to stop all misleading advertising and promotion of Vioxx. Merck was required to take corrective action by issuing a "Dear Healthcare provider" letter to all healthcare providers that may have been exposed to the illegal promotional material for Vioxx. It is unclear how many, if any, Dear Doctor letters were mailed by Merck.

19. In 2001, Eric Topol, MD, Debabrata Mukherhee, MD, and Steven Nissen, MD, of the prestigious Cleveland Clinic, co-authored "Risk of Cardiovascular Events Associated with Selective Cox-2 Inhibitors" in the Journal of American Medical Association. The study revealed

the relative risk of developing a confirmed adjudicated thrombotic cardiovascular event (myocardial infarction, unstable angina, cardiac thrombus, sudden or unexplained death, ischemic stoke or transient ischemic stroke) among Vioxx users in Merck's own trials at a 95% confidence interval was 2.38 compared with naproxen users. In addition, the annualized myocardial infarction rates for Vioxx users compared to placebo users revealed a statistically significant increase among Vioxx users.

20. In response, the FDA wanted to change the Vioxx label to properly inform doctors and patients of the true risks associated with Vioxx. Concerned with profits and not safety, Merck resisted and went on the offensive. They argued that the negative findings were being emphasized. As a result no significant labeling change occurred.

21. Merck being concerned with its stock price, told the financial community in 2001 that Merck would conduct a large cardiovascular study for Vioxx. Merck never did.

22. Merck also responded to Dr. Topol's study by asserting that it was flawed.

23. Dr. Topol has stated that prior to publishing his study, Merck officials paid a visit to his Cleveland Clinic and tried to persuade him not to publish it.

24. In 2002, Dr. Wayne Ray, an Epidemiologist, studied Vioxx patients who were taking high doses of Vioxx and found they had "significantly more heart attacks and strokes than similar patients who were not taking high doses.

25. Upon information and belief it is alleged that Merck's response was that Dr. Ray's study was unreliable.

26. To combat the growing controversy over Vioxx, Merck developed "Dodge Ball" Vioxx training documents for Merck's sales personnel. According the Wall Street Journal, the

document consists of 16 pages with 12 pages devoted to methods that Merck sales personnel should utilize to **"dodge"** doctors questions about the cardiovascular risk associated with Vioxx.

27. In addition to "Dodge Ball" Vioxx training, Merck instituted a campaign to silence academic researchers who raised safety concerns about Vioxx.

28. One example is Stanford University medical researcher Dr. Gurkipal Singh who told the Wall Street Journal that Merck official, Louis Sherwood, called Dr. James Fries, a Stanford University medical professor, to complain about Dr. Singh's lectures regarding the cardiovascular safety of Vioxx. According to the Wall Street Journal, Mr. Sherwood threatened Dr. Singh and implied that there would be dire consequences for Dr. Singh, Dr. Fries, and Stanford University should the criticism of Vioxx continue.

29. Other researchers report that Merck was attempting to suppress any discussion about the adverse cardiovascular data produced by the VIGOR study.

30. In 2002, Elucida Research conducted a study on how Vioxx interacted with lipids, or fatty compounds found in the blood. The study found that Vioxx damaged the lipids in a way that made them more susceptible to clotting.

31. Despite all the concerns over Vioxx and its deadly cardiovascular risks, Merck never conducted a clinical trial regarding the cardiovascular risks of Vioxx.

32. According to Robert Seidman, Chief Pharmacy Officer at Well Point Health Networks Inc., one of the biggest U.S. health plans, " ... Vioxx is an example of the triumph of marketing over science . . . instead of science driving utilization, marketing superceded science."

33. On September 30, 2004, after more than 80 million patients had taken Vioxx, Merck, under pressure from the FDA, withdrew Vioxx from the worldwide market after another study

revealed that Vioxx doubled the risk of heart and/or stroke in users of Vioxx. This represents the largest prescription drug withdrawal in history.

34. Dr. David Graham, reviewer in the Food and Drug Administration's office of safety research, testified before the United States Senate Finance Committee that Vioxx "...caused in the United States between 88,000 to 139,000 strokes and heart attacks . . . Of these people about 55,000 died."

35. The earliest date in which Plaintiff could have become aware that Plaintiff's injuries could have been caused by Vioxx, manufactured, distributed, marketed and promoted by Merck, was on September 30, 2004, when Merck withdrew Vioxx from the worldwide market.

36. Plaintiff incorporates all the allegations plead in the master complaint filed or to be filed in MDL 1657 Vioxx Product Liability Litigation.

**FIRST CAUSE OF ACTION**
**NEGLIGENCE**

37. Plaintiff incorporates the preceding allegations as if fully set forth herein.

38. At all material times, Merck had a duty to exercise reasonable care in all aspects of the testing, labeling, marketing, sale and providing of adequate warnings regarding the use of the drug Vioxx to ensure the safety of the products and to ensure that the consuming public, including the Plaintiff and Plaintiff's physicians obtained accurate information and instructions for the safe use of these drugs.

39. Merck failed to exercise ordinary care in the manufacture, sale, testing, quality assurance, quality control or distribution of Vioxx into interstate commerce; and, Merck knew or should have known that Vioxx created a high risk of unreasonable, dangerous side effects.

40. Merck was negligent in the design, manufacture, testing, advertising, warning, marketing and sale of Vioxx in the following particulars, to wit:

a. Failing to use due care in the design and manufacturing of Vioxx so as to avoid risks to the Plaintiff when such drugs were being used;

b. Failing to accompany their product with proper warnings regarding all possible adverse side effects associated with the use of Vioxx, the comparative severity and duration of such adverse effects, and inaccurate reflection of the symptoms, scope and severity of the side effects;

c. Failing to conduct adequate clinical testing and post-marketing surveillance to determine the safety of Vioxx;

d. Failing to provide adequate training to medical care providers as to the appropriate use of Vioxx;

e. Failure to warn Plaintiff prior to actively encouraging the sale of Vioxx: (1) the need for comprehensive, regular medical monitoring to ensure early discovery of potentially fatal side effects; (2) the possibility of becoming disabled as a result of the Vioxx uses; (3) that treatment or surgery for the side effects of Vioxx use might leave unsightly scars; (4) that procedures utilized as treatment for such side effects may in some situations be fatal; or (5) of the dangers of long term use;

f. Failing to adequately test or warn about the possible adverse side effects caused by the use of Vioxx;

g.. Failing to warn that risks associated with Vioxx use were substantially

greater than any benefit derived from ingestion of the drug;

h. By encouraging Merck detail or sales personnel to evade or dodge questions about the cardiovascular risk or safety of Vioxx;

i. In such other and further particulars as will be proven at trial.

41. Upon information and belief, Merck continued to market Vioxx to consumers, including the Plaintiff, despite the fact that the defendants knew or should have known that these drugs caused unreasonable, dangerous side effects, which many users would be unable to remedy by any means, and when there were safer alternative methods of pain control.

42. Merck knew or should have known that consumers such as the Plaintiff would suffer foreseeable injury as a result of Merck's failure to exercise ordinary care as described above.

43. Merck's failure to act and Merck's actual actions are the direct and proximate cause of Plaintiff's injuries.

**SECOND CAUSE OF ACTION**
**BREACH OF IMPLIED WARRANTY**

44. Plaintiff incorporates by reference all preceding paragraphs and allegations of this Complaint as though fully set forth herein.

45. Merck expressly warranted that Vioxx was safe for use. Vioxx did not, and does not conform to these expressed representations. As a direct and proximate result of the breach of said implied warranties, the Plaintiff has suffered and will continue to suffer damages as set forth above.

46. Merck impliedly warranted to prospective purchasers and users, including the Plaintiff, that the drug Vioxx was safe, merchantable, and fit for the ordinary purposes for which

such goods are used.

47. The Plaintiff reasonably relied upon the skill and judgment of Merck as to whether Vioxx and any use thereof was of merchantable quality and safe and fit for its intended use.

48. Upon information and belief, and contrary to such implied warranties, Vioxx was not of merchantable quality or safe or fit for their intended use, because the product was and is unreasonably dangerous and unfit for the ordinary purposes for which it was used as previously described above.

49. As a direct and proximate result of the breach of implied warranties by Merck, the Plaintiff suffered and will continue to suffer injury, harm and economic loss as alleged herein.

**THIRD CAUSE OF ACTION**
**CONSUMER PROTECTION**

50. Plaintiff incorporates by reference all preceding paragraphs and allegations of this Complaint as though fully set forth herein.

51. By reason of its conduct as alleged herein, Merck violated the provisions of §505/2 ILCS. by inducing the Plaintiff and Plaintiff's physicians to use the drug Vioxx through the use of false and/or misleading advertising, representations and statements.

52. By engaging in the conduct described above, Merck has violated the State of Illinois' Consumer Protection Act by, among other things:

a. Engaging in unfair or deceptive trade practices as defined in this statute by making false and misleading oral and written statements that had, and have, the capacity, tendency or effect of deceiving or misleading consumers.

b. Engaging in unfair or deceptive trade practices as defined in this statute by

making representations that their products have an approval, characteristic, ingredient, use or benefit which they do not have, including but not limited to, their statements concerning the health consequences of the use of these drugs individually or in combination.

c. Engaging in unfair or deceptive trade practices as defined in this statute by failing to state material facts, the omission of which deceived or tended to deceive, including but not limited to, facts relating to the health consequences of the use of these drugs individually or in combination.

d. Engaging in unfair or deceptive trade practices as defined in this statute through deception, fraud, misrepresentation and knowing concealment, suppression and omission of material facts with the intent that consumers rely upon the same in connection with the use and continued use of the drugs individually or in combination.

Conscious and deliberate disregard of foreseeable harm to the Plaintiff, thereby entitling the:

**FOURTH CAUSE OF ACTION**
**STRICT PRODUCT LIABILITY (FAILURE TO WARN)**

53. Plaintiff incorporates by reference all preceding paragraphs and allegations of this Complaint as though fully set forth herein.

54. Vioxx, manufactured and/or supplied by Merck, was at all material times and continues to be unaccompanied by proper warnings concerning all possible adverse side effects including, but not limited to, the comparative severity, scope and duration of adverse effects.

55. Merck also failed to effectively warn users and physicians that numerous other

methods of diabetic control should be first line or exclusive method of control.

56. After Merck knew or should have known of the risk of injury from Vioxx they failed to provide adequate warnings to users or consumers of the product, and continued to aggressively promote the product, and as a direct result thereof, the product manufactured and/or supplied by these defendants was defective due to inadequate post-marketing warning and/or instructions.

57. Upon information and belief, as a producing cause and legal result of the defective condition of Vioxx as manufactured and/or supplied by Merck, and as a direct and legal result of the negligence, carelessness, other wrongdoing and actions of Merck, Plaintiff sustained the damages and injuries set forth above.

58. At all material times, Merck knew of the defective nature of their products, and continued to design, manufacture, market and sell their products so as to maximize sales and profits at the expense of public health and safety, and as such, Merck's conduct exhibits such an entire want of care as to establish that their actions were a result of fraud, evil motive, actual malice, and the conscious and deliberate disregard of foreseeable harm to the Plaintiff, thereby entitling the Plaintiffs to punitive damages.

**FIFTH CAUSE OF ACTION**
**STRICT PRODUCT LIABILITY**
**PURSUANT TO RESTATEMENT OF**
**SECOND OF TORTS Section 402 (1965)**

59. Plaintiff incorporates by reference all preceding paragraphs and allegations of this Complaint as fully set forth herein.

60. At all material times, the Vioxx manufactured and/or supplied by Merck was placed

into the stream of commerce by Merck in a defective and unreasonably dangerous condition in that the known and foreseeable risks associated with the use of these medications exceeded the benefits associated with their design or formulation.

61. Alternatively, the Vioxx manufactured and/or supplied by Merck was defective in design or formulation, such that when it was placed in the stream of commerce, it was unreasonably dangerous in that it was more dangerous than an ordinary consumer would expect and more dangerous than other forms of pain control which were available to the Plaintiffs.

62. The Vioxx manufactured or supplied by Merck was defective due to inadequate warnings or instructions since the manufacturers knew or should have known that the product created a risk of harm to consumers when used in the way it was intended to be used and in a manner which was reasonably foreseeable by these defendants.

63. The Vioxx manufactured and supplied by Merck was defective due to inadequate warnings, inadequate testing, inadequate post-marketing warnings, inadequate post-marketing instructions because after Merck knew or should have known of the risk of injury from Vioxx, Merck did not provide adequate warnings to users or consumers of the product and continued to promote the products.

64. Upon information and belief, Vioxx was at the time it left Merck's control, was a defective product, unreasonably dangerous for use, resulting in injury to the Plaintiff as herein alleged.

65. The defective and unreasonably dangerous condition of Vioxx was the direct and proximate cause of the injuries sustained by the Plaintiff resulting in the damages and injuries set forth above.

66. At all material times, Merck actually knew of the defective nature of their products as set forth herein, and blatantly continued to design, manufacture, market and sell their products so as to maximize sales and profits at the expense of public health and safety, and Merck exhibited such an entire want of care as to establish that their actions were a result of fraud, evil motive, actual malice and the conscious and deliberate disregard of foreseeable harm to the Plaintiff, thereby entitling the Plaintiff to punitive damages.

**JURY DEMAND**

Plaintiffs hereby request a jury trial in this matter.

WHEREFORE, Plaintiff prays for relief as follows:

1. Full refund of all costs for Plaintiff's use of the drug Vioxx;

2. Compensatory, consequential damages and punitive damages individually in excess of the jurisdictional amount;

3. For any and all medical monitoring, past and future medical expenses;

4 For all attorney fees, expenses, interest and costs of this action;

5. For such other extraordinary, declaratory or injunctive relief as permitted by law as necessary to assure that the Plaintiff has an effective remedy; and

6. For such further relief as this Court deems necessary, just and proper.

Dated this 27th day of January 2005.

James Esparza #6282248
1434 East 4500 South, Suite 100
Salt Lake City, Utah 84117
Telephone: 801.272.9100
Fax. 801.272.9102